UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
JOHN B. WEAST IV,

                Plaintiff,

         -against-               <u>MEMORANDUM & ORDER</u>
                                          12-CV-2534(JS)

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
----------------------------------------X
APPEARANCES
For Plaintiff:     John B. Weast IV, <u>pro</u> <u>se</u>
                    43 Summercress Lane
                    Coram, NY 11727

For Defendant:     Vincent Lipari, Esq.
                    United States Attorney's Office
                    Eastern District of New York
                    Central Islip, NY 11722

SEYBERT, District Judge:

        Plaintiff John B. Weast IV ("Plaintiff") commenced this action pursuant to Section 205(g) of the Social Security Act, as amended 42 U.S.C. § 405(g), challenging the Defendant Commissioner of Social Security's (the "Commissioner") denial of his application for disability insurance benefits and Supplemental Security Income ("SSI"). Presently before the Court is the Commissioner's motion for judgment on the pleadings. For the reasons explained below, the Commissioner's motion is DENIED, and this matter is remanded for further consideration in accordance with this Memorandum and Order.

<u>BACKGROUND</u>

Plaintiff injured his back in separate, work-related accidents in 1982 and 1988 respectively.  (R. 241, 461, 491.)[1] Notwithstanding these injuries, Plaintiff continued to work through April 4, 2008.  (R. 178.)  Thereafter, he filed for disability insurance benefits on December 23, 2009 and for SSI on January 25, 2010, asserting that he has been unable to work, and thus disabled, since April 4, 2008.  (R. 151-59.)  Plaintiff attributes his disability to the injuries to his back which causes disordered sleep, as well as his diagnoses of dyslexia and depression.  (R. 178.)  His applications were denied on June 22, 2010.  (R. 96-103.)  On or around August 3, 2010, Plaintiff requested a hearing before an administrative law judge ("ALJ") (R. 104-105), which took place on January 6, 2011, before ALJ Jay L. Cohen (R. 55).  Plaintiff waived his right to be represented by counsel (R. 57) and was the only witness to testify at the hearing (R. 55-74).  After the hearing, the ALJ received responses to written interrogatories that he had served on an independent vocational expert, Dr. David Vangergoot.  A supplemental hearing was held before ALJ Cohen on May 17, 2011 where Plaintiff had the opportunity to question Dr. Vandergoot about his responses.  (R. 75-92.)

---

[1] "R." denotes the administrative record which was filed by the Commissioner on August 15, 2012.  (Docket Entry 11.)

2

The ALJ issued his decision on June 3, 2011, finding that Plaintiff is not disabled.  (R. 9-25.)  Plaintiff sought review of this decision by the Appeals Council (R. 6-8) and submitted additional evidence in support of his request (R. 537-543).  On March 16, 2012, the Appeals Council denied Plaintiff's request for review.  (R. 1-5.)

The Court's review of the administrative record will proceed as follows: First, the Court will summarize the relevant evidence that was presented to the ALJ; second, the Court will review the ALJ's findings and conclusions; third, the Court will summarize the additional evidence submitted to the Appeals Council; and finally, the Court will review the Appeals Council's decision.

I.   Evidence Presented to the ALJ

    A.   Non-Medical Evidence

Plaintiff was born in July 1959 and is a high school graduate.  (R. 151, 183.)  From 1988 through April 2008, Plaintiff was employed by various employers as a diesel truck, tractor trailer, and/or heavy equipment mechanic.  (R. 186.)  As a mechanic, he worked five to six days per week and eight to fourteen hours per day.  (R. 177.)  He was required to walk, stand, sit, climb, stoop, kneel, and crouch for up to eight hours a day, and he would frequently lift items weighing fifty pounds or more.  (R.

3

187-193.)  He ceased working on April 4, 2008,[2] and he asserts that he is unable to work now because he cannot sleep, he has anxiety attacks when he leaves the house, he is dangerous in the workplace, and he forgets things and has trouble concentrating.  (R. 65-66.) Plaintiff testified that, due to issues with his insurance coverage, he had not seen any doctors for his sleep apnea and had not seen a psychiatrist since 2010.  (R. 68-69.)  For his back problems, he has been to the emergency room ten times; the most recent visit was on April 17, 2001.  (R. 69-70.)  Plaintiff also testified that he has seen a chiropractor for his back pain but had never had any surgery or injections.  (R. 67-68.)

------

[2] There is contradictory evidence in the record regarding the reasons why Plaintiff stopped working.  In a questionnaire submitted to the New York State office of Temporary and Disability Assistance, Plaintiff asserted that he "was fired from [his] job for fighting with a co-worker."  (R. 42.)  There is also a Field Report from the Suffolk County Police Department, dated April 4, 2008, that states that Plaintiff called the police to document that he had been fired "because he did not want to work on Sat [sic] 4-5-2008 because he had to get his taxes done."  (R. 276.)  Either way, it seems clear that Plaintiff did not stop working because of the pain associated with his back injury.  (See R. 178 (SSA "Disability Report" questionnaire on which Plaintiff indicates that he stopped working on April 4, 2008 "[b]ecause of other reasons (not my condition) . . . .").

Further, even though Plaintiff testified that he had not worked since April 2008, there is evidence in the record that suggests otherwise.  (R. 308-73, 461, 517.)  Nonetheless, as the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 2008 and the Commissioner does not dispute that finding, this discrepancy is irrelevant to the Court's discussion.

Plaintiff currently resides with his ex-wife in a home that he purchased over thirty years ago. (R. 63.) He stated that severe back pain limits his daily activities. He sometimes needs help putting on his socks and shoes because it is difficult for him to bend. (R. 38.) He does not do extensive house or yard work because it results in severe pain which causes sleep disturbances. (R. 39.) He does, however, do light cleaning, laundry, prepare small meals, and take care of his dogs and cat. (R. 37, 39.) He spends most of his time on the computer completing forms for unemployment and workers' compensation (R. 37) or just staring out the window "ponder[ing] perpetual motion" (R. 70). Although he is able to go out alone and drive a car (R. 39) and can walk up to five miles without having to stop and rest (R. 42), when asked if he goes anywhere on a regular basis, Plaintiff responded: "I really don't go anywhere, but work and home" (R. 41). He has no hobbies or interests and does not socialize. (R. 40-41.)

B.  Medical Evidence

1.  Regarding Plaintiff's Back Injury

Following Plaintiff's injury in 1982, he began receiving weekly chiropractic treatments from Joseph A. Curcio, D.C. for chiropractic care. (R. 250.) These treatments allegedly stopped, for reasons unknown to the Court, six months prior to his 1988

injury.  (R. 250.)[3]  Plaintiff had a CAT scan of his lumbosacral
spine on September 24, 1985, which revealed early degenerative
disc disease at L4-L5, degenerative apophyseal joint disease at
L5-S1, and a suggestion of central posterior subligamentous disc
herniation at L5-S1.  (R. 238, 250.)  Following his injury in 1988,
Plaintiff resumed his weekly chiropractic treatments with Dr.
Curcio.  (R. 250, 252.)

On February 16, 1990, Plaintiff was examined by Dr.
Stillman for "complain[ts] of stiffness and pain in his lower back
and of occasional leg pain (either one)."  (R. 252.)  Dr. Stillman
reported that Plaintiff had a "[p]artial, mild-moderate"
disability and recommended "[s]ymptomatic treatment" when
warranted.  (R. 252.)  Plaintiff saw Dr. Stillman again on May 13,
1992 for "complain[ts] of pain in his lower back with radiation
down both legs."  (R. 250.)  Dr. Stillman again reported that
Plaintiff had a "[p]artial, moderate" disability.  (R. 250.)  He
suggested that Plaintiff cease with the chiropractic treatments
and instead recommended a course of physical therapy on a twice
weekly basis for four-to-six weeks.  (R. 250.)  There are, however,
no physical therapy records in the administrative record.

---

[3] Dr. Curcio's records from this time period are not part of the
record.  Rather, Plaintiff's treatment history is documented in
the records of Sylvan M. Stillman, M.D., F.A.C.S., dated May 13,
1992.  (R. 250.)

Plaintiff saw Dr. Stillman again on March 9, 1994, after his back "started acting up again without any new accident." (R. 251.) Dr. Stillman noted that Plaintiff "is working" but was nonetheless partially disabled and recommended "active care at present" for at least an additional three weeks. (R. 251.)

Plaintiff saw Shafi Wani, M.D., P.C., a neurologist and pain management specialist, on February 15, 2000[4] for "complain[ts] of low back pain, associated with pain radiation into the lower extremeties." (R. 253.) Dr. Wani noted that Plaintiff did not appear to be in "acute distress" but nonetheless needed help undressing and redressing himself for the exam and getting on and off of the exam table. (R. 253-54.) He also noted stiffness and tenderness of the paravertebral lower dorsal and lumbar muscles. (R. 254.) He diagnosed Plaintiff with suffering from chronic low back pain with acute exacerbations. (R. 255.) He advised Plaintiff to continue with the chiropractic treatment and prescribed medications for symptomatic relief. (R. 255.)

The administrative record contains records from Stony Brook Universal Hospital, which reveal that Plaintiff went to the emergency room on May 14, 2000, July 3, 2000, and December 7, 2000 due to severe back pain. (R. 290-94.)

_____

[4] There are no records of Plaintiff receiving any medical treatment between March 1994 and February 2000 in the administrative record.

The administrative record also contains "Doctor's Progress Reports" from Dr. Curcio dated January 2004 through March 2010. (R. 308-459.)[5] During this time, Dr. Curcio treated Plaintiff for lower back and leg pain, spasms, and restricted range of motion. (R. 308-459.) Dr. Curcio's treatment of Plaintiff consisted of chiropractic manipulation, electrical muscle stimulation, and heat. (R. 308-459.) Among the records are two separate series of progress reports to the workers' compensation board, and Dr. Curcio's notes regarding Plaintiff's treatment.[6] In the progress reports for May 13, 2008 through March 11, 2009, Dr. Curcio noted that Plaintiff was working but had a partial impairment and could not perform regular work duties. (R. 354-373.) In the progress reports for March 31, 2009 through February 11, 2010, Dr. Curcio noted that Plaintiff's date of injury was May 11, 1988, that Plaintiff's diagnoses were lumbar radiculopathy, chronic sprain/strain, low back pain/post-surgical, and lumbar intervertebral disc syndrome, and that Plaintiff continued to work. (R. 308-352.)

At the request of Plaintiff's workers' compensation insurance carrier, on May 9, 2005, Plaintiff was examined by

_____

[5] There is a letter in the record from Dr. Curcio that states that he lost many of his older records in a fire. (R. 374.)

[6] Dr. Curcio's notes include 196 entries based on visits from January 16, 2004 to March 1, 2010 (R. 375-457).

Richard Dark, D.C., after he complained that he had exacerbated his back injury approximately a week earlier. (R. 295-96.) Dr. Dark diagnosed Plaintiff as suffering from lumbar disc syndrome and recommended that he receive chiropractic treatment two times per week for four weeks and on a symptomatic basis thereafter. (R. 299.)

At the request of Plaintiff's workers' compensation insurance carrier, on June 15, 2006, Plaintiff was examined by another chiropractor, Gary Cohen, D.C. (R. 258-61.) Dr. Cohen noted that Plaintiff exhibited a "moderate degree of discomfort" when extending and compressing his sacroiliac joints bilaterally and diagnosed Plaintiff with suffering from cervical and lumbar sprains and strains. (R. 260.) He stated that although Plaintiff had reacted favorably to conservative chiropractic treatment, he believed that the "full benefit and pre-injury status ha[d] been attained," and recommended continued symptomatic treatment only. (R. 261.)

Again at the request of Plaintiff's workers' compensation insurance carrier, on January 4, 2008, Plaintiff was examined by John Kiesecker, another chiropractor. (R. 303-307.) Dr. Kiesecker observed that Plaintiff had a normal heal to toe gait and that Plaintiff's "[m]uscles of the lower extremity were of good tone and absent of atrophy or fasciculations." (R. 305-06.) However, Plaintiff's straight leg raises tested positive for

lower back pain at sixty degrees for his right leg and fifty degrees for his left leg. (R. 306.) Further, Plaintiff's "[p]alpatory evaluation revealed lumbar rigidity and complaints of pain to the sacral base." (R. 306.) Dr. Kiesecker recommended that Plaintiff continue chiropractic care on a symptomatic basis of twice per month to maintain his current level of functioning. (R. 307.)

Plaintiff saw Dr. Kiesecker again on February 17, 2010. (R. 268.) Plaintiff told Dr. Kiesecker that his pain was a level two out of ten, but that he was not taking any medication. (R. 271.) He also indicated that, even though Dr. Kiesecker previously advised that he receive chiropractic care no more than twice a month, he was still seeing Dr. Curcio weekly. After examining Plaintiff, Dr. Kiesecker concluded that continued chiropractic care was not necessary, in part because he had received an extensive amount of care to date with little improvement. (R. 272.)

Dr. Wani examined Plaintiff again on June 1, 2010 regarding complaints of pain involving his mid and lower back associated with recurrent acute spasms. (R. 461.) Dr. Wani reported that Plaintiff had been working on a sporadic basis for the last two years. (R. 461.) He noted that Plaintiff is well built, well-nourished, and not in any acute distress. (R. 462.) Plaintiff did, however, exhibit a restricted range of lumbar

motion.  (R. 463.)  Dr. Wani opined that Plaintiff was suffering
from a mild-to-moderate partial disability.  (R. 463.)

        On June 9, 2010, Dr. Erlinda Austria, a consultative
physician, examined Plaintiff.  (R. 489-491.)  In Dr. Austria's
report, she noted that Plaintiff appeared to be in no acute
distress, exhibited a normal gait, walked without difficulty, was
able to rise from his chair without difficulty, and did not need
help changing clothes or getting on and off the exam table.  (R.
490.)  She assessed that Plaintiff could move his head, neck, and
upper extremities without restriction, but that his ability to
squat, bend, sit for a prolonged period of time, stand, or walk
was minimally-to-mildly restricted.  (R. 491.)   Dr. Austria
diagnosed Plaintiff with herniated and bulging lumbar discs at L1
to S1 and noted that his prognosis was stable with conservative
treatment.  (R. 491.)

        On June 22, 2010, another doctor, Dr. Kuehnlenz,
performed a "Physical Residual Functional Capacity Assessment" of
Plaintiff.  (R. 492-97.)  The Assessment revealed that Plaintiff
had a herniated lumbar disc with radiculopathy.  (R. 492.)  It
also noted the following exertional limitations:  Plaintiff could
occasionally lift no more than twenty pounds, could frequently
lift up to ten pounds, and could stand or walk no more than six
hours in an eight hour workday.  (R. 493.)  The Assessment also

11

stated that Plaintiff was unable to return to his previous job, which involved "medium work." (R. 493.)

On August 31, 2010, Plaintiff had an MRI scan of his lumbar spine. (R. 514.) The MRI revealed that his spinal canal was within normal limits in size, and there was no evidence of spinal stenosis. (R. 514.) There was also no evidence of loss of height involving the lumbar vertebral bodies, and the bone marrow demonstrated normal signal intensity. (R. 514.) No intradural lesions or paravertebral soft tissue abnormalities were identified. (R. 514.) The MRI did reveal a disc herniation at the L2-L3 level causing a small ventral impression upon the thecal sac and partially compromising the L1-L2 neural foramina bilaterally. (R. 515.) The MRI also revealed disc bulging at the L1-L2 level, disc bulging at L3-L4 through L5-S1 levels which impinged on the thecal sac and partially compromised the adjacent neural foramina bilaterally, degenerative disc disease, and straightening of the lumbar spine. (R. 515.)

Dr. Wani examined Plaintiff again on October 27, 2010 for complaints of middle and lower back pain associated with marked stiffness and difficulty sitting and bending. (R. 517.) Dr. Wani conducted a neurological examination and noted trapezius muscle stiffness and tenderness on both sides. (R. 517.) He diagnosed Plaintiff with "[c]hronic mid and lower back pain status post trauma with MRI evidence of extensive lumbar disc disease and

clinical evidence of chronic posttraumatic myofacial pain and dysfunction involving dorsolumbar region in the right worse than left." (R. 518.) Just as on June 1, 2010, Dr. Wani assessed a mild to moderate partial disability. (R. 463, 518.)

The next day, on October 28, 2010, Plaintiff had an MRI of his thoracic spine, which revealed multilevel mild degenerative disc changes with shallow non-compressive disc protrusions. (R. 512-513.) There was no evidence of canal stenosis, foraminal impingement, or vertebral body compression fractures. (R. 513.)

    2.   <u>Regarding Plaintiff's Dyslexia, Depression, and Sleep Apnea</u>

On or around October 20, 1977 when Plaintiff was a senior in high school, he was diagnosed with a severe degree of developmental dyslexia by Vincent F. Perlo, M.D., the director of the Language Disorders Unit at Massachusetts General Hospital. (R. 232.) Dr. Perlo recommended a remedial program to last over several years and anticipated that Plaintiff could improve his reading and spelling skills significantly. (R. 232.)

In or around October 1995, Plaintiff was referred to Helen R. Hoffman, Ph.D., a licensed psychologist, for testing for vocational planning. (R. 240.) Dr. Hoffman noted that Plaintiff still had difficulty with reading, writing, and math; however, he had been able to graduate high school with resource room assistance. (R. 240-41.) The report noted an average full scale

IQ of 103.  (R. 243.)  However, Plaintiff's scaled subtest IQ scores ranged from borderline to very superior, which, according to Dr. Hoffman, was a "very wide scatter." (R. 243.)  Dr. Hoffman noted that Plaintiff had "a severe learning disability across academic areas," including Developmental Reading Disorder, Developmental Expressive Writing Disorder, and Developmental Arithmetic Disorder.  (R. 244.)  Dr. Hoffman reported that, in addition to his learning disorder and dyslexia, Plaintiff was suffering from depression and anxiety due to his inability to meet his financial obligations.  (R. 246.)  She diagnosed Plaintiff with "Anxiety Disorder Not Otherwise Specified," with depressive features.  (R. 248.)  Dr. Hoffman recommended vocational counseling, supportive psychotherapy or counseling, and remediation and accommodation for severe learning disabilities. (R. 248.)  Plaintiff, however, did not follow through with Dr. Hoffman's recommended treatment.  (R. 286.)

On October 11, 2000, Dr. Anthony Verga conducted a psychiatric evaluation of Plaintiff for complaints of an ongoing depressive disorder that Plaintiff asserted was the result of his inability to work due to his back injuries.  (R. 285.)  According to Dr. Verga's records, Plaintiff had stopped working in August 1999 when his "back really went out bad," and his attempts at returning to work were unsuccessful.  (R. 285.)  His wife was in the process of divorcing him "due to his inability to provide for

14

his family and other ongoing difficulties." (R. 285.) Dr. Verga diagnosed Plaintiff with suffering from a long standing history of depressive disorder that he felt was a "moderate partial disability." (R. 287.) He recommended further medical treatment in the form of continued sessions with a psychologist once every two weeks. (R. 287.)

On May 27, 2010, Plaintiff was evaluated by Dr. Daryl Di Dio, Ph.D., for complaints of depression due to chronic pain, and sleep difficulties. (R. 532-536.) Plaintiff completed a questionnaire in connection with this evaluation stating that he did not have any health problems for which he was receiving treatment and that he was not currently taking any medications. (R. 533.) Dr. Di Dio assessed that Plaintiff was in pain, that he could not return to work, and that he was severely depressed. (R. 534-535.) He also noted that Plaintiff was "attempty [sic] to get on SSA." (R. 535.) Although Dr. Di Dio had been treating Plaintiff since 2000, this was the only record of Dr. Di Dio's in the administrative record before the ALJ. (See R. 531.)

On June 9, 2010, Plaintiff was evaluated by Dr. Kathleen Acer, a consultative psychologist. (R. 465-468.) Plaintiff told Dr. Acer that he last worked in April 2008; he was fired because he was unable to work on a Saturday, but he could not return to work because of his back injury. (R. 465.) Plaintiff stated that he was in treatment for depression with a psychologist in 2004 but

15

was not currently in treatment or taking any medications.  (R. 465.)  Dr. Acer's mental status examination revealed that Plaintiff's speech was fluent and clear.  (R. 466.)  His thought processes were coherent and goal directed, his affect was dysphoric, his mood was dysthymic, his recent and remote memory skills were intact, and his intellectual skills were average.  (R. 466.)  She also noted that Plaintiff was able to dress, bathe, and groom himself, and he could cook, clean, do laundry, shop, manage money, and drive.  (R. 466.)  With regard to Plaintiff's vocational capacities, Dr. Acer concluded that Plaintiff could follow and understand directions and instructions, appropriately perform tasks, maintain attention and concentration, and maintain a regular schedule.  (R. 467.)  She noted, however, that he may have difficulty dealing with stress and relating to others.  (R. 467.)  Dr. Acer concluded that the results of the evaluation appeared to be "consistent with psychiatric issues," but not significant enough to interfere with his functioning.  (R. 467.)  She diagnosed Plaintiff with pain disorder associated with a general medical condition and chronic back pain.  (R. 467.)  She recommended counseling.  (R. 467.)

Also in the record is a report from Dr. Lopez, a state agency psychiatric consultant, dated June 15, 2010.  (R. 469-88.)  Dr. Lopez did not personally examine Plaintiff.  Rather, his report

is based on a review of SSA's records.[7]  Dr. Lopez concluded that
Plaintiff's complaints of sleep apnea due to depression were
"credible, but not to the degree alleged."  (R. 485.)  He noted
that Dr. Acer's opinion that Plaintiff may have difficulty
adequately relating to others was not consistent with the findings
of the mental status examination that she performed.  (R. 485.)
He concluded that Plaintiff "is capable of following supervision,
relating appropriately to coworkers and performing [substantial
gainful activity]," although he "may be precluded from performing
tasks requiring a high degree of stress."  (R. 485.)

     C.   <u>Vocational Expert Testimony</u>

        In March 2011, Dr. Vandergoot, a vocational expert,
responded to interrogatories submitted by the ALJ.  (R. 227-228.)
Dr. Vandergoot asserted that Plaintiff's past work as a truck
mechanic was medium in exertion and that, through that work,
Plaintiff acquired the ability to use hand and power tools, use
shop math, work to precise specifications, and use problem-solving
strategies.  (R. 227.)  The ALJ asked whether a hypothetical
individual of the same age, educational background, and work
experience as Plaintiff, who was limited to light work with limited
contact with supervisors, coworkers, and the public, could perform
Plaintiff's past relevant work in a low stress environment.  (R.

---

[7] What was included in SSA's records at the time is not stated in
the report.

227.)  Dr. Vandergoot responded that such an individual could not perform Plaintiff's past work because it was medium in exertion. (R. 227.)  Dr. Vandergoot asserted that such a person could, however, perform other jobs, such as a control supply worker, photocopy machine operator, and clerical checker.  (R. 227.)  The ALJ then asked if the same hypothetical individual, this time limited to sedentary work opposed to light work, could perform Plaintiff's past relevant work.  (R. 228.)  Again, Dr. Vandergoot responded that such an individual could not perform Plaintiff's past relevant work because it was medium in exertion, but he could perform a substantial number of jobs in the regional and national economy including: small products assembler, addresser, and clerical sorter.  (R. 228.)  It is unclear whether Dr. Vandergoot considered Plaintiff's dyslexia or the effects of his depression on his ability to interact with others when providing these answers.

At the May 2011 ALJ hearing, Plaintiff asked Dr. Vandergoot "how many of these jobs that you have lined up can a person do without sleep?"  (R. 82.)  Dr. Vandergoot responded: "A person could not do any of these jobs if they could not sleep." (R. 82.)

II.  Decision of the ALJ

After reviewing all of the above evidence, the ALJ issued his decision on June 3, 2011, finding that Plaintiff is not

18

disabled.  (R. 12-20.)  With respect to Plaintiff's back pain, the ALJ found that while his "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,] . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with [his] residual functional capacity assessment."  (R. 16.)  The ALJ noted that not a single doctor that evaluated or treated Plaintiff's back injury noted that he was incapable of working but, rather, that these doctors believed that Plaintiff was suffering from a partial disability only.  (R. 16-17.)  With respect to Plaintiff's depression, the ALJ found that Plaintiff "received minimal treatment only, with very limited findings on the one time examination with Dr. Didio [sic]," and that Dr. Acer did not indicate that Plaintiff was suffering from a disabling mental condition of any type.  (R. 18.)

        The ALJ ultimately found that, although Plaintiff was unable to perform his past work as a truck mechanic or even a full range of light work, his symptoms did not prevent him from performing some types of light work, such as employment as a control supply worker, a photocopy machine operator, or a clerical checker.  (R. 19.)

III. Additional Evidence to Appeals Council

        Subsequent to the June 3, 2010 ALJ decision, Plaintiff submitted two additional documents to the SSA Appeals Council:  a

psychoeducational evaluation report dated August 22, 2011 (R. 539-
43), and a letter from Dr. Di Dio dated September 19, 2011 (R.
537-38).

The psychoeducational evaluation report was prepared by
Dr. Di Dio and Kerri Hughes, M.S. based on their evaluations of
Plaintiff on August 9, 10, and 15, 2011.  (R. 539.)  Dr. Dio and
Ms. Hughes concluded that Plaintiff was suffering from a "specific
learning disability within the areas of Reading and Written
Language."  (R. 543.)  Specifically, the results of their tests
indicated that Plaintiff had significantly weak reading and
spelling skills and low-average Performance IQ (which measures his
ability to solve nonverbal problems), Working Memory Index (which
measures his fluid reasoning and special processing skills as well
as his attention to detail), and Processing Speed Index (which
measures his ability to process visual information quickly and
efficiently).  (R. 540-41.)  They believed that his "reported
difficulty with maintaining employment may be attributable to
these underlying cognitive defects."  (R. 543.)

In Dr. Di Dio's letter, he noted that he had been
treating Plaintiff "on and off" since January 3, 2000.  He
described Plaintiff as "remarkably depressed, sad, withdrawn,
socially isolated with poor appetite and sleep disturbance[,]
hopeless and . . . anhedonic."  (R. 537.)  He diagnosed Plaintiff
with suffering from major depressive disorder, learning disorder

20

(reading), schizoid personality disorder, multiple injuries by history, and economic, physical, and family stress. (R. 538.) He concluded that Plaintiff's learning difficulties, combined with his depression and physical difficulties, "make him unsuitable for a return to any form of employment." (R. 538.)

IV.   Decision of the Appeals Council

The Appeals Council denied Plaintiff's appeal of the ALJ's determination, stating that they "found no reason under [the] rules to review the Administrative Law Judge's decision." (R. 1.) Thus, the ALJ's decision is considered the final decision of the Commissioner. (R. 1.)

DISCUSSION

Plaintiff commenced this action on May 17, 2012. (Docket Entry 1.) The Commissioner filed his Answer and the administrative record on August 15, 2012 (Docket Entries 10, 11.) On January 4, 2013, the Commissioner moved for judgment on the pleadings. (Docket Entry 20.) On February 14, 2013, this Court held oral argument on the motion. The motion is presently before the Court.

I.   Standard of Review

In reviewing the ruling of the ALJ, this Court will not determine de novo whether Plaintiff is entitled to SSI or disability benefits. Thus, even if the Court may have reached a different decision, it must not substitute its own judgment for that of the ALJ. See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir.

1991).  Instead, this Court must determine whether the ALJ's findings are supported by "substantial evidence in the record as a whole or are based on an erroneous legal standard." Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000) (internal quotations marks and citation omitted), superseded by statute on other grounds, 20 C.F.R. § 404.1560.  If the Court finds that substantial evidence exists to support the Commissioner's decision, the decision will be upheld, even if evidence to the contrary exists.  See Johnson v. Barnhart, 269 F. Supp. 2d 82, 84 (E.D.N.Y. 2003).  "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support a conclusion."  Id. (citing Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)).  The substantial evidence test applies not only to the ALJ's findings of fact, but also to any inferences and conclusions of law drawn from such facts.  See id.

        To determine if substantial evidence exists to support the ALJ's findings, this Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences may be drawn."  See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (internal quotation marks and citation omitted).  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405(g).

II.   Eligibility for Benefits

A claimant must be disabled within the meaning of the Social Security Act (the "Act") to receive SSI or disability benefits.  See Byam v. Barnhart, 336 F.3d 172, 175 (2d Cir. 2003); 42 U.S.C. § 1381a.  A claimant is disabled under the Act when he can show that "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The claimant's impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  Id. § 1382c(a)(3)(B).

The Commissioner must apply a five-step analysis when determining whether a claimant is disabled as defined by the Act.  See Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); Petrie v. Astrue, 412 F. App'x 401, 404 (2d Cir. 2011).  First, the claimant must not be engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i); 20 C.F.R. § 416.920(a)(4)(i).  Second, the claimant must prove that he suffers from a severe impairment that significantly limits his mental or physical ability to do basic work activities.  Id. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  Third, the claimant must show that his

23

impairment is equivalent to one of the impairments listed in Appendix 1 of the Regulations. Id. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Fourth, if his impairment or its equivalent is not listed in the Appendix, the claimant must show that he does not have the residual functional capacity to perform tasks required in his previous employment. Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Fifth, if the claimant successfully makes these showings, the Commissioner must determine if there is any other work within the national economy that the claimant is able to perform. Id. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The claimant has the burden of proving the first four steps of the analysis, while the Commissioner carries the burden of proof for the last step. See Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009). "In making the required determinations, the Commissioner must consider: (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience." Boryk v. Barnhart, No. 02-CV-2465, 2003 WL 22170596, at *8 (E.D.N.Y. Sept. 17, 2003).

In the present case, the ALJ performed the above analysis, and his conclusions as to the first three steps do not appear to be in dispute. He found that Plaintiff had not been

engaged in substantial gainful activity since April 4, 2008 and
that his condition constituted a severe impairment that limited
his capacity to work.  (R. 14.)  The ALJ next determined that
neither the Plaintiff's impairments nor a medical equivalent was
among those enumerated in Appendix 1 and then proceeded to
determine whether Plaintiff retained the residual functional
capacity to perform his past work as a truck mechanic.  (R. 15.)
The ALJ found that although Plaintiff was not capable of performing
his past work, he had the residual functional capacity to perform
some light work.  (R. 19.)

        The Court must determine whether this final decision is
supported by substantial evidence.  With respect to the new
evidence submitted to the Appeals Council, it is deemed part of
the record and will be considered by the Court when determining if
there is substantial evidence to support the Commissioner's final
decision.  See Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)
("When the Appeals Council denies review after considering new
evidence, we simply review the entire administrative record, which
includes the new evidence, and determine, as in every case, whether
there is substantial evidence to support the decision of the
Secretary.").

        The Court will discuss the ALJ's decision with respect
to Plaintiff's alleged physical and mental disabilities
separately.

25

A.   <u>Evidence of Physical Disability</u>

Plaintiff was examined by seven separate doctors regarding his back pain:  his treating physicians, Drs. Stillman, Curcio, and Wani; Drs. Dark, Cohen, and Kiesecke, chiropractors examining Plaintiff on referral from Plaintiff's workers' compensation insurance carrier; and the consultative examiner for SSA, Dr. Austria.  None of these doctors concluded that Plaintiff was disabled.  In fact, many of the doctors, including his treating physicians, concluded that Plaintiff was only partially disabled. (R. 250 (Dr. Stillman noting that Plaintiff was only partially disabled); R. 354-73 (Dr. Curcio stating that Plaintiff was only partially impaired); R. 463 (Dr. Wani concluding that Plaintiff was suffering from a mild-to-moderate partial disability); R. 491 (Dr. Austria noting that Plaintiff had minimal-to-mild restrictions only).)

The only evidence in the record to support the conclusion that Plaintiff's physical ailments rendered him disabled is Plaintiff's subjective reports of pain, which the ALJ discounted (<u>see</u> R. 16).  The Second Circuit has held that "the subjective element of pain is an important factor to be considered in determining disability." <u>Mimms v. Heckler</u>, 750 F.2d 180, 185 (2d Cir. 1984).  However, "[t]he ALJ has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence,

regarding the true extent of the pain alleged by the claimant." McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 705 (2d Cir. 1980) (alteration in original) (internal quotation marks and citation omitted).  The Court will uphold the ALJ's decision to discount a claimant's subjective complaints of pain so long as the decision is supported by substantial evidence.  See Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984).

Here, the ALJ found that although "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible." (R. 16.)  The Court finds that there is substantial evidence in the record to support this conclusion, specifically: (1) Plaintiff's own statements regarding his ability to perform physical activity (R. 42 (stating that he could walk for five miles without stopping); R. 37, 39 (stating that Plaintiff does light cleaning, laundry, prepares small meals, and takes care of his dogs and cat)); (2) the fact that Plaintiff did not take any medications to ease his alleged back pain (R. 533); and (3) the fact that he continued to work for nearly twenty years after his initial injury and ultimately stopped working for reasons unrelated to his back pain, see supra note 2.

27

Accordingly, the Court finds that there is substantial evidence to support the ALJ's conclusion that Plaintiff's physical ailments did not render him incapable of performing light work.

B.    Evidence of Mental Disability

With respect to Plaintiff's dyslexia, the ALJ noted that Plaintiff "was diagnosed with this condition as a teenager, but . . . was able to master his past work as a truck mechanic, a skilled position, and successfully perform[] this job for a prolonged period." (R. 18.)  Thus, the ALJ found that it did not prevent Plaintiff from performing certain types of light work. (R. 18.)  There was no evidence before the ALJ at the time to suggest otherwise.  However, Plaintiff submitted to the Appeals Counsel the psychoeducational evaluation that was performed by Dr. Di Dio and Ms. Hughes, which revealed that Plaintiff had serious difficulties reading, writing, processing visual and oral information, and solving non-verbal problems.  (R. 540-41.) Whether and to what extent these deficiencies affect the types of "light work" that Dr. Vangergoot believes Plaintiff can perform is not explained anywhere in the record.  Thus, remand is required to further develop the administrative record regarding the effects of Plaintiff's dyslexia and other learning disabilities on his ability to work.

With respect to Plaintiff's depression and sleep apnea, the ALJ decided to give little weight to the opinion of Plaintiff's

treating physician, Dr. Di Dio, who concluded that Plaintiff's depression and related sleep apnea rendered him incapable of returning to work. According to the "treating physician rule," however, the medical opinions and reports of a claimant's treating physicians are to be given "special evidentiary weight." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). Specifically, the regulations state:

> Generally, we give more weight to opinions from your treating sources. . . . If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

When an ALJ does not accord controlling weight to the medical opinion of a treating physician, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citation omitted); see also Schnetzler v. Astrue, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). Such factors include:

> (1) the length of the treatment relationship and frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by medical and laboratory findings; (4) the physician's consistency with the record as a whole; and (5) whether the physician is a specialist.

29

Schnetzler, 533 F. Supp. 2d at 286 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Halloran, 362 F.3d at 32). Additionally, the ALJ is required to provide "'good reasons' for the weight she gives to the treating source's opinion." Halloran, 362 F.3d at 32-33; see also Pagan v. Apfel, 99 F. Supp. 2d 407, 411 (S.D.N.Y. 2000) ("At the very least, the Commissioner must give express recognition to a treating source's report and explain his or her reasons for discrediting such a report."). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

       Here, the ALJ stated that he gave Dr. Di Dio's opinion little weight because his findings were "very limited" and he examined Plaintiff only one time. (R. 18.)  However, the record indicates that Dr. Di Dio actually treated Plaintiff more than once. (See R. 286 (Dr. Verga's records, indicating that Plaintiff was seeing Dr. Di Dio on a weekly basis in 2000); R. 531 (letter from Dr. Di Dio stating that he had been treating Plaintiff since 2000); R. 537 (letter from Dr. Dio stating that he had been treating Plaintiff "on and off since January 3, 2000"). Further, although Dr. Di Dio's records are lacking in detail and it is unclear whether he relied on "medically acceptable clinical laboratory diagnostic techniques" as required by the Regulations, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), "failure to include

this type of support for the findings in [his] report does not mean that such support does not exist," Rosa, 168 F.3d at 79 (internal quotation marks and citation omitted).  "[H]e might not have provided this information in the report because he did not know that the ALJ would consider it critical to the disposition of the case."  Id. (internal quotation marks and citation omitted). Thus, "[t]he ALJ has an 'affirmative duty' to seek out additional information from the treating physician if there are gaps in the record," like there appear to be here.  Sarchese v. Barnhart, No. 01-CV-2172, 2002 WL 1732802, at *4 (E.D.N.Y. July 19, 2002); see also Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] sua sponte.").

Thus, remand is also required for further development of the administrative record regarding the effects of Plaintiff's depression and sleep apnea on his ability to work and for the proper application of the treating physician rule to Dr. Di Dio's conclusions.

CONCLUSION

For the foregoing reasons, the Commissioner's motion is DENIED, and this action is REMANDED for further proceedings consistent with this Memorandum and Order.

31

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Memorandum and Order would not be taken in good faith; therefore, in forma pauperis status is DENIED for the purpose of an appeal.  See Coppedge v. United States, 369 U.S. 438, 444-45, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962).

The Clerk of the Court is directed to send a copy of this Memorandum and Order to the pro se Plaintiff and mark this matter CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

DATED:     August   6  , 2013
           Central Islip, NY

32